

# EXHIBIT 2



UNITED STATES DISTRICT COURT

FOR THE

WESTERN DISTRICT OF TENNESSEE


ROWVAUGHN WELLS,

     Plaintiff,

v.        Civil Action No. 2:23-cv-02224-SHL-atc

CITY OF MEMPHIS, et al.,

     Defendant.

_____


VIDEOTAPED DEPOSITION OF


GEOFFREY ALPERT, PHD


TAKEN ON

FRIDAY, APRIL 17, 2026

10:25 A.M.


1501 MAIN STREET, SUITE 501

COLUMBIA, SOUTH CAROLINA 29201



NAEGELI DEPOSITION & TRIAL | (800) 528-3335
NAEGELIUSA.COM

VIDEOTAPED DEPOSITION OF

GEOFFREY ALPERT, PHD

TAKEN ON

FRIDAY, APRIL 17, 2026

10:25 A.M.

THE VIDEOGRAPHER:  We are on the record. The time is 10:25 a.m.  The date is April 17th, 2026.  This is the beginning of the deposition of Geoff Alpert.  The case caption is Wells versus Memphis.

Will Counsel introduce yourselves and --

THE REPORTER:  Oh, we already did that.

THE VIDEOGRAPHER:  The court reporter will now swear in the witness.

THE REPORTER:  Okay. All right.  Mr. Alpert, will you please raise your right hand?  Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MR. ALPERT:  Yes, ma'am.

THE REPORTER:  Thank you.

Go ahead, Counsel, you may proceed.

GEOFFREY ALPERT, PHD, having been first duly affirmed to tell the truth, was examined and

testified as follows:

EXAMINATION

BY MS. SILK:

Q.    Good morning, Mr. Alpert.

A.    Good morning.

Q.    Good morning.  We spoke off the record, and you told me that I could call you Dr. Alpert, Mr. Alpert, or Professor, or even Geoffrey, right?

A.    Yes, ma'am.

Q.    I'm going to probably go with Professor.

A.    Okay.

Q.    I think that feels right to me, so if that's fine with you, I'll just call you Professor.

A.    Yes, ma'am.

Q.    Could you please state your full name for the record?

A.    Geoffrey Alpert.

Q.    And Mr. Alpert, Professor, I know you've given a ton of depositions so I probably don't need to go over the ground rules, but I think the main thing is we just need to make sure that we're not talking over each other.  So when I stop talking, you can talk.

And I'm sure Mr. Levin is going to be making a lot of objections, so we'll have to give

deposition notice, which we'll mark as collective Exhibit 1.

(WHEREUPON, Exhibit 1 was marked for identification.)

THE REPORTER:  Exhibit 1 marked.

BY MS. SILK:

Q.   Oh, did you bring that with you?

A.   Yes.

Q.   Okay.  Is -- okay.  Well, we're going to get to it.

A.   I ran out of black ink.  Sorry about that.

Q.   Oh.  No, it's okay.  We'll give you a copy.

MS. KELSEY MCKINNEY:  And here you go, Josh.

MR. LEVIN:  Thanks.

BY MS. SILK:

Q.   All right.  You are going to be handed what is marked as collective Exhibit 1, which is the subpoena in this case.

Before we do that, tell me about your conversation -- your conversations with Mr. Levin since they are not your attorney.

MR. LEVIN:  Objection, that's covered by work product privilege, so he can't disclose the

contents of our communications.

MS. SILK:  Well, he can disclose the content of your communications as it relates to certain issues like scheduling and compensation.

MR. LEVIN:  So I'm going to instruct the witness, you can disclose only as relates to compensation --

MS. SILK:  You don't -- you're not his attorney.

MR. LEVIN:  Okay.  I can instruct the witness in order to preserve work product privilege under Rule 24.  So he --

MS. SILK:  I object to your instructing the witness.  You're not his attorney.

MR. LEVIN:  Okay.  I can instruct the witness in order to preserve the work product privilege, which is held by -- which is held by the plaintiff.  This is absolutely permissible, to instruct a witness under Rule 24 to preserve -- to preserve work product.

So you can disclose our communications only as relates to compensation, scheduling. Scheduling is --

MS. SILK:  That's not true.

MR. LEVIN:  I mean, we can read --

MS. SILK:  If you're not prepared to instruct the witness, then don't instruction the witness.

MR. LEVIN:  I just gave my instruction.

BY MS. SILK:

Q.  Okay.  Well, I would like to ask you begin to please tell me about your conversations with your counsel -- with counsel for plaintiff.

MR. LEVIN:  Same objection.  Same instruction.

THE DEPONENT:  Yeah.  Most -- well, the part I'm willing to disclose or that had to do with scheduling, which there's quite a bit of scheduling going on to get this done today, and took a lot of rescheduling other things to come in.

And then compensation, which was -- had to do with -- I mean, I've got a fee agreement with them, and then it was just deposition fees.

BY MS. SILK:

Q.  What -- when were you contacted about scheduling this deposition?

A.  It's been going on for several weeks. When -- when they asked me for dates, I think it's been a couple of times they asked me for a series of dates, and it's probably maybe 10 days, two weeks

ago, something.  I mean, I'm guessing, where when I gave them these dates and it was rejected.  And again, do I still have these dates, so a lot of back and forth.

Q.   Okay.  And I will represent to you that it was relayed to us that you were initially only available for half a day today, and then alternatively Monday.  Does that comport with your recollection?

A.   That's correct.  And then I had to move, I had a -- I just had shoulder surgery so I had to move some doctors' appointments, which I was able to do, and that's why today opened up.

Q.   So those were the only two dates that you provided to Counsel for plaintiff for the deposition?

A.   Within that period, yes.

Q.   Between now and May 15?

A.   Yeah, that's correct.

Q.   Did you know that the deadline for deposing all the experts is currently set at May 15th?

A.   I think that was mentioned that was the end date, yes.

Q.   All right.  Let's go back to the subpoena

here.  You received this subpoena, sir?

A.   Yes, ma'am.

Q.   Okay.  And then attached -- this is an exhibit.  It's the exhibit.

A.   Oh, I -- I've got a copy.

Q.   That's okay, hold on.  We're going to get it.  Give us one second.

MS. KELSEY MCKINNEY:  Okay.

MS. SILK:  Can you share your screen?

MS. KELSEY MCKINNEY:  Mm-hmm.

MS. SILK:  All right.  If you can just send it to me.  Okay.

BY MS. SILK:

Q.   All right, Professor, sorry about that. What we handed you does not include the Exhibit A, but may I?

A.   Oh, please.

Q.   Take a look at yours.  I'll just confirm it's the same.  Yeah, it appears to be the same, okay.  All right.  So you were instructed to bring certain documents with you pursuant to the subpoena. Did you bring those documents with you today?

A.    I had sent some of the documents to Counsel, and the others I did not.

Q.   Okay.  Which -- let's start with number 1.

All publications and articles cited in the Expert Report dated April 3rd.  Did you bring those with you today?

A.   No, because those are publicly available, and they're cited and easily available to any of you.

MR. LEVIN:  And plaintiff's counsel did provide, on the witness' behalf, certain articles to -- to opposing counsel.

BY MS. SILK:

Q.   So you provided -- we were provided three -- we were provided one article and two other publications.  That was it.

A.   Yeah, I think those are the ones that I ended up downloading.  The rest I -- I would look up and use, but I didn't keep copy -- didn't keep PDFs of them, so I -- I would have had to go back and do -- go back and -- on the internet and find them all, and either print them out or put them on a thumb drive.

MR. LEVIN:  And for the record, the subpoena was provided to plaintiff's counsel on April 15th -- excuse me, the rider, the document rider was provided to plaintiff's counsel on April 15th at 11:16 a.m., less than 48 hours before the

deposition.

BY MS. SILK:

Q.    So your testimony, sir, is that you don't -- you didn't retain or save the rest of the publications and articles cited in your report?

A.    That's correct.

Q.    Okay.  Number 2, all facts and data used to support the Expert Report.  What's your response to that?  Did you bring any facts or data with you?

A.    Well, I had no idea what that meant.  All -- I mean, all the facts and data used to support my -- my opinions are in the files, and -- and other -- other than the ones I cited that would be in number 1.

Q.    Did you have a conversation with plaintiff's counsel about what you would be bringing today?

A.    Yes, ma'am.

Q.    Okay.  And what did they instruct you to bring?

A.    Well, they just said bring what you can.

Q.    Okay.  Did you bring anything?

A.    No, and I'm happy to go through the list and explain why.

Q.    Okay.  All right.  I just want to make

sure so I don't have to ask you every time, did you bring it.

A.    Yes, ma'am.

Q.    Okay.  You didn't bring anything on this list.

A.    That's correct.

Q.    Okay.  So now we'll just go through why you --

MR. LEVIN:  The witness provided, through plaintiff's counsel --

MS. SILK:  Please stop interrupting me.  I -- you have already --

MR. LEVIN:  I can make my record.  I said, witness provided through plaintiff's counsel, documents that we provided to you in advance of the deposition.  Those are responsive to the subpoena.

MS. SILK:  That's not the question, Josh. The question -- the question that he answered was, did you bring anything with you today, and he said he did not.  There's not -- there is nothing more to be said about it.

MR. LEVIN:  That was not your question.

MS. SILK:  It literally was.

BY MS. SILK:

Q.    Professor, let's go on to number 3.  Did

you -- we understand that you did not bring any demonstratives, exhibits, or charts that you intend to use to support your report at trial.  Why not?

A.   None exist.

Q.   Thank you.

A.   You're welcome.

Q.   Why did you not bring communications with plaintiff's counsel relating to the compensation for your work on this case?

A.   I don't keep emails.  I don't keep any communication.

Q.   You don't keep any email?

A.   No, ma'am.  And in fact, the university gets -- they cycle through --

MS. ELIZABETH MCKINNEY:  We're having trouble with the sound.  He's not -- we're not getting whatever he's saying at all.

THE REPORTER:  Give me one second.

MR. MCMULLEN:  Yeah, Mr. Alpert, it -- it seems like when you turn your head a certain way, we lose part of the sound.

THE REPORTER:  Okay.  Can we go off the record for just a minute?

MS. SILK:  Sure.  We're going to go off the record.

THE VIDEOGRAPHER:  All right.

MS. ELIZABETH MCKINNEY:  Thank you.

THE VIDEOGRAPHER:  The time is 10:43 a.m. and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 10:46 a.m. and we are on the record.

BY MS. SILK:

Q.   Okay, Professor, I think when we got interrupted with the technical difficulties, you were explaining to me something about why you don't retain emails.

A.   Oh, I --

Q.   Can you continue with that?

A.   Oh, I -- I just don't.

Q.   What email address do you use to communicate with plaintiff's counsel in this case?

A.   I use GeoffA at -- at sc.edu.

Q.   And so --

A.   Oh, I'm sorry, it's GeoffA@mailbox.sc.edu.

Q.   Okay.  And is that your University of South Carolina email address?

A.   That's correct.

Q.   Okay.  And is it your testimony today that you delete those emails --

A.     Yes, ma'am.

Q.     -- related to --

A.     Well, I delete all my emails when -- when they're of no use.

Q.     And does the University of South Carolina have a retention policy on emails?

A.     Well, they -- I -- we -- that's what I started to say, that they cycle through and -- and there's so many I guess, they just eliminate them all after -- I don't know what the date is, seven days, 14 days, something like that.

Q.     So is it -- you're telling me that you -- how often do you delete them?  Like, when you read it do you delete it?

A.     If I don't need it or don't use it, yes.

Q.     And would you ever need to review a communication about compensation for like tax purposes?

A.     Not a -- not an email.

Q.     Okay.  What about documents regarding your compensation, are those preserved?

A.     Give me an example.  I'm not sure --

Q.     Like an invoice.

A.     Oh, yeah.

Q.     Did you bring any of those with you today?

A.   I don't have any invoices.  I think -- I think I sent one several years ago, but I have not sent an invoice in years.

Q.   You have -- you think you sent an invoice in this case to plaintiff's counsel?

A.   Years ago.

Q.   Okay.  And how much was that invoice for?

A.   I don't remember because I usually -- I don't remember if they gave me a retainer which I usually have, but I just don't recall in this case if I got one, and I don't remember what the amount was, but I -- I'm -- I can find out.

Q.   Yeah, I believe that was -- that's one of the items on the subpoena, but we'll -- we'll get to that.

So you don't retain any emails, so you didn't bring any of those emails with you.

What about communications with plaintiff's counsel -- is your answer going to be the same for all these communications with plaintiff's counsel?

A.   Yeah.  Yes, ma'am.

Q.   How did you receive the information that you reviewed?

A.   Dropbox.

Q.   Dropbox, okay.  Are all those files still

in a Dropbox somewhere?

A. The ones I downloaded, yes.

Q. Okay. And how did you choose which ones to download?

A. Well, I would go through them and if I thought they were important or they would be something I really would need, I'd download it.

Q. Do you have communications with any other persons other than the attorneys relating to this case?

A. No. No, I haven't talked to anyone. You asked me that earlier.

Q. If we were to ask plaintiff's counsel for those communications, would they have communications regarding compensation?

MR. LEVIN: Objection, form.

THE DEPONENT: I -- I would assume.

BY MS. SILK:

Q. So there were communications about compensation.

A. I don't remember any, other than if I sent that invoice in a few years ago, which I think I did. That would be the only -- and I -- and I did send a fee agreement, but those would be the only ones.

Q.   How much was the retainer?

A.   Well, that's what I don't recall.  I mean, in today's -- today's contract it's $8,000.  I don't remember what it was back then, or if I got one.

Q.   So your standard retainer today is $8,000. And what does that retainer -- what does it retain you to do?

A.   Well, it retains me to work on the case, and I work that off at an hourly rate, 550 an hour.

Q.   But you don't recall what your retainer was when you were retained in this case?

A.   That's correct.

Q.   But you could access that information if you needed to?

A.   I don't recall getting a signed contract until just recently, so I don't know -- I -- you know, I looked for the invoice when I got this.  I couldn't find it, but that doesn't mean it's not somewhere in my computer.

Because I did send -- if I had it, I sent it, and it's going to be somewhere, but I couldn't find it in the few, you know, in the few hours I spent trying to go through all this.

Q.   So would you have started working on a case without receiving a retainer?

A.    Yes, ma'am.

Q.    Okay.  Is that typical?

A.    Well, if I've worked with the lawyers before, or -- a lot of state agencies don't give you retainers, a lot of government will not give retainers, so yeah.

Q.    When are the other times you've worked with these attorneys before, counsel for plaintiff?

A.    I probably worked with Romanucci and Blandin a dozen times, maybe more.

Q.    A dozen times.  What are some of those cases?

A.    Most of them -- they're split between Use of Force and Pursuit cases.

Q.    What do you mean by Pursuit case?

A.    High speed police chases.

Q.    And are those typically negligence cases?

A.    As opposed to?

Q.    Policy and Practice cases.

A.    I think I've probably done a few of the Monell cases with -- on pursuits, but mostly just...

Q.    Negligence.

A.    Negligence, yes, ma'am.

Q.    Let me go back to my Exhibit A here.  The subpoena asks you to provide all expert reports

submitted by you from the past five years involving police practices, use of force, pursuits, and/or police culture.  Why did you not bring any of those?

A.   Well, I'm not going to provide you reports without permission from the other attorneys, and I didn't have time.  And most of the time when I ask other attorneys in the past, they say no.

Q.   Even if they're filed publicly, you wouldn't --

A.   Well, that --

Q.   -- have to have permission, right?

A.   Well, I don't -- I don't keep old reports, so I don't --

Q.   You don't keep any of your old reports?

A.   No.

Q.   Why not?

A.   Why would I?

Q.   Why wouldn't you?  I mean, you're an academic.

A.   Well, I don't publish -- this is not an area of -- of research I do where I publish.  I'm sorry, that's not true.  This is an area of research, but not from -- not from cases.  I don't publish information that I learn -- it's a whole different world, publishing, where you have to go

through IRBs, research review boards, to get permission, and -- and I -- I just never published anything from -- from doing expert witness work.

Q.    But they're public filings.

MR. LEVIN:  Objection, form.

THE DEPONENT:  Is that a question?

BY MS. SILK:

Q.    Well, guess my -- my question is, I just want to confirm that your testimony here today is that you don't have any of your prior expert reports saved.

A.    When the cases are settled, yeah, I hit delete.

Q.    You hit delete.

A.    Yes, ma'am.

Q.    When will you delete this report?

A.    When the case settles or goes -- settles either through trial or settlement, and there's no reason for me to keep it.  And as you say, that -- there are -- a lot of them are available -- most lawyers will keep them, but I've never -- I've never, in the -- gosh, 35, 40 years of doing expert witness work, I've never been asked to go back, other than requests like this from -- from current cases for past cases.  But I've never -- never

searched for any of --

Q.    You don't ever think --

A.    -- my reports.

Q.    -- like in, if you do a bunch of pursuit cases, which I -- which it appears that you do based on your -- your testimony that you provided, you don't ever think -- you don't ever save a report to maybe, you know, use part of the analysis in another report?

MR. LEVIN:  Objection, form.

THE DEPONENT:  They would be other data. There wouldn't be -- they wouldn't be relevant.

BY MS. SILK:

Q.    So you just start completely over every time.

A.    Well, in terms of writing a report, yeah. I don't -- I mean, I don't go back -- the only thing I save is the boilerplate language in the front, because everything else, the -- the incident description, the -- if there -- if there are any data or -- or -- I don't do a literature review in these reports, so, yeah, I start from -- start over again.

Q.    How do you keep from being inconsistent from report to report to report?

A.    Because I've been doing this a long time. I'm the one who's done most of the research that I reference, and it's just part of my knowledge and experience.

**Q.    When you had these 12 cases with Romanucci and Blandin, did you prepare reports for those?**

A.    Well, there were some I -- I was retained and looked at, and said no, said you got nothing. So didn't do anything on those.  They were -- most of them that I worked on for them that I found, you know, positive issues to -- to go on, yes, I did repair reports.

**Q.    Okay.  So presumably you could ask Mr. Levin for permission to share those reports here today, right?**

MR. LEVIN:  Objection, form.

MS. SILK:  That's not a -- there's nothing to object to there.

MR. LEVIN:  Objection, form.

MS. SILK:  I'll ask him.  Does he have your permission to share his reports?

MR. LEVIN:  Objection, form.

MS. SILK:  I'm asking you, Counsel.

MR. LEVIN:  What is your question, Ms. Silk?

MS. SILK:  He says he has to get permission from the other attorneys from who has submitted reports before he can share them with you. He then had testified that he has written reports for Romanucci and Blandin.

I'm asking you if he has permission to share those reports with us pursuant to the subpoena.

MR. LEVIN:  You sent a subpoena less than 48 hours before the deposition.  If you have a request for something, you can put it in writing. We'll consider it.

MS. SILK:  It's in writing, right here, right now.

MR. LEVIN:  The request --

MS. SILK:  Will --

MR. LEVIN:  The request you just made?

MS. SILK:  It's -- it's in Exhibit A.  And you -- you felt compelled to provide certain documents on behalf of the witness.  Now I'm asking you, will you -- will you provide the reports that he wrote for Romanucci and Blandin that are responsive to this subpoena.

MR. LEVIN:  We'll consider it and get back to you.

MS. SILK:  We will be taking this up with the court.  We also did not --

MR. LEVIN:  We'll -- we'll make clear to the court that you provided this document rider 48 hours before the deposition.

MS. SILK:  I welcome that.

MR. LEVIN:  Okay.

MS. SILK:  I welcome that conversation with the court.

BY MS. SILK:

Q.   It's -- it's -- why would Mr. Levin not agree to provide the reports?

MR. LEVIN:  Objection, form.

BY MS. SILK:

Q.   In your opinion.

A.   I have no opinion.  I don't know.

Q.   Tell me about the reports that you provided in -- to Romanucci and Blandin.  Were they Use of Force cases?

A.   They were -- they were mostly pursuit cases, but I think there were a couple of Use of Force cases.

Q.   Okay.  Were there any -- in those Use of Force cases, can you be more specific, what were the facts of those cases?

A.   Oh, it's been five, six, seven year -- ten years.  I don't have much recollection about those cases.

Q.   All right.  We also asked for transcripts of your testimony listed in the cases on Exhibit C to your report.  Do you keep copies of transcripts of your testimony in those cases?

A.   Depositions and if I give trial testimony, no.

Q.   All right.  Section 5 on the subpoena were fee agreements and billing records in this matter, including retainer agreements, invoices, and records of payments received.  And we touched on this earlier.  You mentioned, and just for clarification, that you believe there was an invoice from years ago.

A.   Correct.

Q.   And would that be 2023?

A.   '23 or '24, something like that.

Q.   Okay.  But you didn't -- but you didn't bring that today.

A.   No, I --

MR. LEVIN:  Asked and answered.

THE DEPONENT:  I couldn't find it.

BY MS. SILK:

Q. Okay.

A. I think -- it's got to be somewhere on my computer, I just don't know where I put it. It's not where -- it's not in the -- the folder I have with these documents.

Q. Okay. And then records of payments received.

A. I -- I mean...

Q. You have banking records that would have shown that you received a payment?

A. If back then -- I don't -- I mean, I did not look in my bank, but I don't think -- I'd have to go make a special effort because it is not -- it's not -- it doesn't go back that far on the internet, I don't think. I'd have to make a special request for that, for a check to find it.

Q. Okay. But those same records, presumably counsel for plaintiff would have; is that correct?

MR. LEVIN: Objection, form.

THE DEPONENT: Well, if they wrote a check, yes, ma'am.

BY MS. SILK:

Q. And they would also have a copy of -- they should, in your -- you would agree with me, have a copy of a retainer agreement, invoices?

A.   Yeah, I -- again, well they should have the invoice if they paid -- if they paid it.  I don't recall getting a signed agreement until recently, but as we discussed a few minutes ago, that's not uncommon where I don't get a retainer.

Q.   Okay.  The number -- when was the most recent case that you provided consultation for Romanucci and Blandin, other than this one?

A.   I think it was George Floyd.

Q.   Okay.  And what did you do in the George Floyd case?  What -- did you prepare a report?

A.   I don't think I wrote a report.  I think it settled pretty quickly, and I was in the process -- I don't think I wrote anything.

Q.   So what were you engaged to do in the George Floyd case?

A.   Well, analyze the use of force.

Q.   And what data or records were you given, if anything, to review, if anything, in that case?

A.   You're going back a few years so I'll try my best.  I don't remember the specific information I was sent, but there was a lot of it, and a lot of it had to do with the specific event, and a lot of it had to do with records from Minneapolis police.

Q.   And what was the case -- tell me the case,

the -- if that was the most recent one, what was the next to most recent one?

A.   Oh, that -- I only remember that one because of its infamy.  I don't remember the -- I remember there were some pursuit cases we've worked on over the years, and Use of Force cases, but I can't be -- I don't remember what they were.

Q.   I -- I may have misheard you, but when -- when we were conversing off the record earlier I thought I heard you mention some case where you said Tony flew you from Australia.  Are you talking about Tony Romanucci?

A.   Yes, ma'am.

Q.   Okay.  Tell me about that case.

A.   Oh, that was a -- it was a -- I believe it was a Use of Deadly Force case that trial -- either I had missed the timing or it came up quickly, because I was working in Australia and I had to fly back to testify.

Q.   What year was that?

A.   I mean, I have no idea.

Q.   You seem to be having some trouble with your memory.

MR. LEVIN:  Objection, form.  Argumentative.

THE DEPONENT:  I don't think I'm having problems with my memory.  I just -- why would I remember the year.  I -- I have been working in Australia about 16, 17 years, and I fly back and forth two, three times a year.  Why would I remember what year that was.

BY MS. SILK:

Q.   Well, because, I mean, it seems notable that you were emergently flown from Australia by plaintiff's counsel to testify.  That's not just a routine trip, so I'm just asking you what that -- what that -- what was the case?

A.   It was a case -- it was a shooting, police shooting.

Q.   What case was it?

A.   I don't know.

Q.   You don't remember?

A.   No.

Q.   Being flown emergently from Australia to testify in a case, you don't remember the case?

A.   I do remember flying into -- into Orlando.

Q.   Orlando, okay.  Was it against the Orlando Police Department?

A.   I don't think so, but I don't remember.

Q.   Again, did you prepare a report in that

case?

A.    Probably.

Q.    **What was your conclusion?**

A.    That it wasn't a very good shooting.

Q.    **And you don't remember the --**

MS. ELIZABETH MCKINNEY:  I'm sorry.  This is Betsy McKinney, and we're having trouble -- I'm having trouble hearing some of his answers.  It's almost like there's -- they're muted, or -- Bruce, are you having problems?

MR. MCMULLEN:  Yeah, but not as much as before.  This is Bruce McMullen speaking.  Not as -- not as much as before.

MS. SILK:  I can scoot it a little closer.

THE DEPONENT:  Is it this microphone, or --

MR. LEVIN:  No.

MS. SILK:  No, this is for the video.

THE DEPONENT: Video.  Okay.

MS. SILK:  Let's move this here.

MR. LEVIN:  The mic for the Zoom is in the laptop, right?

THE DEPONENT:  Oh, okay.

MS. SILK:  What is this?

MS. KELSEY MCKINNEY:  That's for her.

THE REPORTER:  That's for -- for me.

MS. SILK:  Okay.

THE REPORTER:  That's the most important thing.

MS. SILK:  Okay.  Well, let's scoot it -- can we move his -- Betsy, we're scooting closer.

MS. ELIZABETH MCKINNEY:  Okay.  It's just kind of like trailing off at the end a little bit, and so if you'll just --

MS. SILK:  Okay.

MS. ELIZABETH MCKINNEY:  -- continue to speak up throughout the whole response, that would be great.  I'm sorry.

MS. SILK:  That's all right.  You've got to be able to hear.  All right.  Let us know if this is any better.

Professor, could you say something?

THE DEPONENT:  Does this make -- is this louder?  Do you want me to speak up?  What's the -- how are we doing now?

MS. ELIZABETH MCKINNEY:  That's -- that's good.

MR. MCMULLEN:  Yeah, yeah, if you could speak up.

THE DEPONENT:  I'm just very soft spoken,

so it's hard for me to do that.

BY MS. SILK:

Q.    All right.  We're still on Exhibit A, or Exhibit 1.  What is it called -- Exhibit A, the subpoena, and we're on to the last section here, Reliability and Methodology, and you were asked to bring documents relating to testing, validation, peer review, or standards underlying the methodology applied in the Expert Report in this case.

Why didn't you bring any of that stuff?

A.    Because the -- I explained the methodology in my report, and I included citations.  And you may have gotten, of the several documents you received I think there were a couple on the methodology.

Q.    Okay.  We -- we received three documents from -- from plaintiff's counsel.  Did you provide those to plaintiff's counsel or did plaintiff's counsel provide them on their own?

A.    No, those are ones I sent to them.

Q.    Okay.  And let's -- let's talk about those.  Give me just one second.  Okay.  All right. One of them is entitled -- the title says carpeter -- Carpenter Put It In Writing.  It's from October 2000, a law enforcement bulletin.  What -- what was that?

or not.

Q.    Okay.

A.    So I -- I don't know how to answer your question other than I don't recall.

Q.    Have you ever testified as an expert witness about a culture of brutality existing in a police department?

A.    I -- yeah, years ago, it -- I haven't done Monell cases recently, so in other Monell cases I've testified in I have talked about a culture of -- of violence, yes.

Q.    Which ones?

A.    It's been a long time, I don't -- I don't remember.

Q.    Like five years, 10 years?

A.    No, much -- probably 10 years, maybe even longer.

Q.    All right.  I'd like to go back to kind of what we were talking about earlier with the retainer agreement in this case.  Can I show you that?  It's something that you produced to counsel who produced to us, and we're going to mark it as Exhibit 4.

(WHEREUPON, Exhibit 4 was marked for identification.)

THE REPORTER:  Exhibit 4 marked.

MR. LEVIN:  Sorry.

THE DEPONENT:  Thank you.

BY MS. SILK:

Q.    Okay.  Is this the document that you provided to Mr. Levin?

A.    Yes.

Q.    Okay.  And what is the date of this agreement?

A.    April 3rd, this year.

Q.    Okay.  So were you -- I think your testimony earlier is that you were retained in 2023.

A.    Correct.

Q.    Where is that retainer agreement?

A.    I told, I -- I didn't get one, which happens periodically.

Q.    Okay.  And this one was executed one day before the expert disclosure deadline which was April 4th; is that right?

A.    I -- it says April 3rd, I don't know what the...

Q.    Okay.  Did you have communications with Romanucci and Blandin prompting them to execute this?

A.    No.

Q.    They just did it on their own.

A.   I believe so, yes.

Q.   Okay.  When did you send this to them?

A.   I don't know.

Q.   Was it near April 3rd?

A.   If they had asked me for one, yes.
Otherwise I may have sent it earlier.  I -- I just
-- I don't -- I don't know.

Q.   You mentioned earlier that you know now
that your retainer is $8,000 but you don't recall
what your retainer was when you were initially
engaged; is that right?

A.   That's correct.

Q.   And so here it says the retainer is
$8,000.  Have you been paid that $8,000 for this
retainer?

A.   I believe I did.  I mean, I do have
records for that, so.

Q.   Okay.  Because it was dated April 3rd.

A.   Yeah, yeah.

Q.   So I mean, that was --

A.   Oh, no, I mean, I haven't gotten a check.

Q.   It was two weeks ago.

A.   I haven't gotten a check recently.

Q.   Okay.  So how much have you been paid in
this case?

A.    Well, I couldn't find the original, so I don't even remember what the -- I think they gave me a retainer back in 2023, and I -- if I recall correctly, I submitted a bill and was paid, but I don't remember.  I know I have that, I just couldn't in the time -- it wasn't -- it wasn't where it was supposed to be on my computer.

Q.    Okay.

A.    But I know I have it.

Q.    Okay.  So do you know how much you've been paid on this case?

A.    No.

Q.    You don't have any idea?

A.    Well, I -- I mean, I don't remember what the retainer was, so I don't remember --

Q.    Okay.

A.    I think the bill was somewhere -- it was higher than -- it was higher than the retainer, because I remember getting paid, but I don't remember what -- exactly what it was.  It was probably -- I mean, I'd be speculating.

Q.    Well, I mean, that's all we've got because I -- I'm just trying to figure out how much you have been paid on this case.  I mean, was it more than $10,000?

MS. SILK:  I welcome that.

THE VIDEOGRAPHER:  The time is --

MS. ELIZABETH MCKINNEY:  What kind of break are we talking?

MS. SILK:  45 minutes.

THE VIDEOGRAPHER:  -- p.m. and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 2:07 p.m. and we are on the record.

BY MS. SILK:

Q.  **All right, Professor, we're back from lunch.  It took a little bit longer than I thought, so I apologize for that, but we're here and ready to get started.**

**I wanted to show you some communications that were produced by counsel for plaintiff.  That's going to be Exhibit 6.**

THE REPORTER:  Yes, ma'am.

(WHEREUPON, Exhibit 6 was marked for identification.)

THE VIDEOGRAPHER:  Exhibit 6 marked.

MR. LEVIN:  Thank you.

MS. SILK:  Okay, there you go.  Sorry.

BY MS. SILK:

Q.   Professor, these communications were produced by counsel for plaintiff, and you'll see that they have a Bates number at the bottom here that reflects that, right?

A.   Yes, ma'am.

Q.   So my first question is, did you provide these communications to them to produce pursuant to the subpoena or did --

A.   No.

Q.   Okay.  All right.  Have you seen these before?

A.   I mean, I remember, sort of.

Q.   But you haven't seen them as a complication?

A.   I don't think so.

Q.   Okay.  All right.

A.   I think they sent me some.  I don't remember.

Q.   Okay.  So on this first page here it says Wednesday April 1st, it appears to be -- we're missing something here, because it says from Colton Johnson Taylor to Geoffrey Alpert, April 1st, 2:44 p.m.

Hi Geoff, sorry to bombard you.  Do you have a fee schedule or retainer agreement spelling

that out?

What -- spelling what out?

A.   I think I talked to him on the phone, because my fees have gone up since I last worked on the case.

Q.   Okay.  So you think you had a phone conversation with him asking for a fee?

A.   I think I had told them that my fees had gone up since the last time I worked on the case, which was 2023 or 4, something.  And then I think he -- if I recall write he wrote and said, do you have a fee schedule spelling all that out, which I sent them.

Q.   Okay.

A.   And it's on here, and the one you -- the one signed that you've seen.

Q.   So do you know if there was a written communication prior to this that prompted this?

A.   No, I think it was telephone.

Q.   Okay.  And then if you flip to Bates number Wells_010264, it is an email from Colton Johnson Taylor, Tuesday April 7th, 2026, and it's regarding deposition dates on April 7th.  And it says, Geoff can you provide dates for depositions in the next three weeks.  I know that is a tight time

frame, but let me know if you have any availability.

This is the first time they reached out to you about deposition dates; is that right?

MR. LEVIN:  Objection, form.

THE DEPONENT:  No.  There had been -- I mean, whatever this is above that I wrote to him --

BY MS. SILK:

Q.    That's a subsequent email, right?

A.    I don't -- no, this is April 7th.

Q.    Yeah.

A.    Okay.  Yeah, I don't -- I don't remember if it was the first time, but I just -- in my response, because I had that -- I had mentioned to you, I had shoulder surgery and I had a doctor's appointment that I was able to move, but I -- I don't know if -- I don't know if this was or wasn't the first time.

Q.    But there's no email earlier than this in this packet regarding deposition dates, is it?

A.    I don't know.  I skipped over.

Q.    Okay.

A.    It looks like it goes from April 1st to April 9th, so.

Q.    I'm asking specifically about deposition dates.  The April 1st email is about a fee schedule,

as you've testified --

A.   Right, right.  And then April 7th is the deposition date.

Q.   Is the first date that you were -- that you have a written communication -- that we have a written communication --

A.   Yeah.

Q.   -- regarding scheduling dates.  Is that accurate?

A.   I think written.  I -- I seem to remember that we had -- that they called me about deposition dates before, and that's when I was screwing around, seeing what my schedule was.

Q.   And then as of April 7th, they are asking you to provide dates for deposition.

A.   Right.

Q.   Okay.  And do you have any other emails regarding the scheduling of this deposition that we don't have here today?

A.   I do not.

Q.   Okay.  Were you dealing primarily with Colton Johnson Taylor when you were scheduling your deposition, or Mr. Levin, or someone else from Romanucci and Blandin?

A.   No, I think just the two of them.

Q.    Who would you say you dealt with more?

A.    I think most of the time they were all on the call.

Q.    Okay.  Because most of these emails are with -- with Mr. Colton Johnson Taylor as the primary sender and recipient.  I'm just curious if there was a division of labor there.

MR. LEVIN:  Objection to form.

BY MS. SILK:

Q.    And then on the back two pages appears to be text message.  Did you provide this text message, or did --?

A.    No.  I certainly -- I certainly don't keep text messages.

Q.    Well, color me shocked.

A.    Although I think -- I think those stay on -- I don't always delete them sometimes.

Q.    Okay.  So obviously this is also not a complete text message, because you can see from the stop that there's more to it.  Do you have these text messages with plaintiff's counsel about the logistics of your deposition and payment and whatever?

MR. LEVIN:  Objection to form.

THE DEPONENT:  I don't know.

BY MS. SILK:

Q.   Because those would be responsive to our subpoena.  We are entitled to those, so we are going to ask that you provide those to us.

MR. LEVIN:  The only things that you're entitled to are what's permitted under Rule 26(b)(4)(c).  Objection.

MS. SILK:  Okay.  And clearly we're missing some of that, so.

MR. LEVIN:  No, clearly you're not.  You can make whatever --

MS. SILK:  It's cut off.

MR. LEVIN:  -- hypotheticals --

MS. SILK:  It's cut off, Josh.  I mean --

MR. LEVIN:  Well, it's not cut off.

MS. SILK:  -- look at the document.

MR. LEVIN:  It's not cut off.  It says, K thanks.

MS. SILK:  No.  It says 1501 Main Street. There's clearly something before that that you did not produce.  So there's probably lots of stuff you haven't produced, and that's why I'm asking him, because it --

MR. LEVIN:  And none of it --

MS. SILK:  Let me finish.

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

end of the deposition of Geoff Alpert.  The court -- actually, that's already done, and the time is 5:36 p.m. and we are off the record.

(WHEREUPON, the videotaped deposition of GEOFFREY ALPERT, PHD was concluded at 5:36 p.m.)

CERTIFICATE


I, the undersigned, Leon Schatz, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certfy that I have accurately made the videorecording of the deposition of Geoffrey Alpert, MD, in the above captioned matter on the 17th day of April, 2026, taken at the location of Columbia, SC.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.


Leon Schatz

CERTIFICATE

I, Alessandra De Souza, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 24th day of April, 2026.

Alessandra De Souza, CER No. 5264